IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,256

In the Matter of the Care and Treatment of
TODD ELLISON.

SYLLABUS BY THE COURT

1.

A person's pretrial detention under the Kansas Sexually Violent Predator Act, K.S.A. 59-29a01 *et seq.*, is a deprivation of liberty that requires due process protection.

2.

The multifactor test used in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) (length of delay, reason for the delay, assertion of right to speedy trial, and prejudice to the defendant) to assess constitutional speedy trial rights in criminal cases provides the appropriate ad hoc approach to evaluate claims of undue delay in proceedings brought under the Kansas Sexually Violent Predator Act.

3.

An appellate court's standard of review when considering applications of the *Barker* factors to a specific claim of undue delay in proceedings brought under the Kansas Sexually Violent Predator Act is to assess the district court's factual findings for substantial competent evidence and to review de novo the legal conclusions to be drawn from those facts.

Review of the judgment of the Court of Appeals in 51 Kan. App. 2d 751, 359 P.3d 1063 (2015). Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed December 9, 2016.

1

Judgment of the Court of Appeals reversing the district court and remanding for further proceedings is reversed. Judgment of the district court is affirmed.

*Natalie Chalmers*, assistant solicitor general, argued the cause and was on the briefs for appellant.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

BILES, J.: Todd Ellison is a convicted sex offender. The State seeks to have him involuntarily committed under the Kansas Sexually Violent Predator Act (KSVPA), K.S.A. 59-29a01 *et seq*. To do that, it must prevail at trial. See K.S.A. 59-29a06. But Ellison waited in jail more than 4 years without a trial, so the district court ordered him released after weighing the speedy trial factors set out in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) (length of delay, reason for the delay, assertion of right to speedy trial, and prejudice to the defendant). Our question on appeal is whether the State denied Ellison due process when it detained him for that extraordinary length of time without a trial. On the record before us, we agree with the district court and affirm its order of release.

FACTUAL AND PROCEDURAL BACKGROUND

The KSVPA is a comprehensive statutory scheme for the civil commitment of persons alleged to be sexually violent predators for "potentially long-term control, care and treatment" after they have served their criminal sentences. K.S.A. 59-29a01. The act defines a sexually violent predator as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence."

2

K.S.A. 59-29a02(a). When it appears a person within the jurisdiction of the Department of Corrections or Parole Board meets the statutory requirements for such commitment, the agency must notify the attorney general 90 days before that person's release. K.S.A. 59-29a03(a); see also K.S.A. 59-29a02(f).

If the attorney general decides to seek commitment, a civil petition must be filed in the district court. See K.S.A. 59-29a04(a). That court must then determine if there is probable cause to believe the person is a sexually violent predator. If so, the court must direct that the person be taken into custody. K.S.A. 59-29a05(a). The alleged sexually violent predator must also be given notice and an opportunity to appear at a hearing to contest the probable cause determination within 72 hours. K.S.A. 59-29a05(b).

If the initial probable cause determination stands, the court must direct that the person be transferred to an appropriate secure facility, including a county jail, for evaluation of whether the person is a sexually violent predator. K.S.A. 59-29a05(d). After that, the person is entitled to a jury trial during which the State must prove its case beyond a reasonable doubt. K.S.A. 59-29a06(c); K.S.A. 59-29a07(a).

In Ellison's case, when the petition was filed the KSVPA required his trial to be held within 60 days after the probable cause hearing. See K.S.A. 59-29a06(a). But the statute also permitted a continuance "upon the request of either party and a showing of good cause, or by the court on its own motion in the due administration of justice, and when the respondent will not be substantially prejudiced." K.S.A. 59-29a06(a). The act further provided that the 60-day time limit was not jurisdictional, and the failure to comply did not prevent the attorney general from proceeding. K.S.A. 59-29a06(e).

Involuntary detention under the act must "conform to constitutional requirements for care and treatment." K.S.A. 59-29a09. Once committed, an individual "shall have a

3

current examination of the person's mental condition made once every year." K.S.A. 59-29a08(a). In addition, the individual is entitled to annual written notices of the right to petition for release. K.S.A. 59-29a08(a).

The State filed its KSVPA petition against Ellison on June 1, 2009. It alleged he was still in prison finishing out his sentence and that the Department of Corrections had certified he might meet commitment criteria. The appearance docket reflects a probable cause hearing on June 25, 2009, with probable cause found to exist. At some point during this period, Ellison went to the Sedgwick County jail.

Ellison's trial was first set for September 21, 2009. The appearance docket reflects this date was continued by agreement three times to January 19, 2010. Nothing in the record indicates who sought these continuances or for what purposes. Next, Ellison obtained four continuances, resulting in a September 20, 2010, trial date. But on September 10, the court granted a pro se motion for new counsel. Three days later, Ellison's current counsel was appointed. Ellison then obtained three more continuances, resulting in an April 25, 2011, trial date. But that trial was then continued by agreement to July 18, 2011. This date was subsequently "[c]ontinued for control purposes—attys to get back with the court." Ellison's case was assigned to three different district judges between September 20, 2010, and its final assignment to Judge Benjamin L. Burgess in February 2012.

On June 21, 2012, Ellison filed several motions, three of which advocated for his immediate release on these theories: (1) the KSVPA was "facially unconstitutional"; (2) the KSVPA was "altered by the legislature and the Kansas Attorney General to the point that it now acts as a criminal statute"; and (3) the KSVPA violates due process. The third argument was the procedural vehicle the district court ultimately used to dismiss the case and free Ellison.

4

A month later, on July 23, 2012, Ellison petitioned this court for a writ of habeas corpus, raising the same claims advanced in the district court seeking his release. By this time, Ellison had been awaiting trial for 1,124 days. In his habeas petition, Ellison conceded "a good deal of [time since the State filed its KSVPA petition] is attributable to Mr. Ellison and his attorneys . . . ." We summarily dismissed the habeas action on June 19, 2013.

While the habeas action was pending, the State responded to Ellison's June 2012 motions for release in April and May 2013. On May 6, 2013, the district court held a hearing related to Ellison's June 2012 motions for release, at which it commented:

"[A]s we all know, this petition against Mr. Ellison was filed June 1, 2009. That's four years ago. Here we are still and not—and I understand some of the other pleadings, but I did look this morning too with regard to continuances. There have been seven continuances by the defendant. And there's been other continuances by agreement. So, yes, this case has been on a—well, it's been delayed for a lot of different reasons for probably too long. And I'm—would be the first to agree that Mr. Ellison is entitled to have his day in court eventually and it should be sometime soon."

More than 9 months later, at a February 10, 2014, hearing, the district court again took up Ellison's June 2012 motions, denying all but the motion claiming the KSVPA violated due process. Turning to that motion, the court recognized Ellison did not have a statutory right to a speedy trial but believed there were "some quasi-criminal issues that . . . should be considered with regard to [the due process] motion." The court calculated that 1,705 days would elapse between Ellison's probable cause hearing in 2009 and the then-scheduled trial date, February 24, 2014. Judge Burgess also produced his own summary of previous hearings, which included his handwritten notes and highlighting reflecting his attempt to track continuances and attribute them to the parties.

5

First, the court assigned the following causes to the delay: 204 days due to agreed continuances, 461 days due to Ellison's continuances, 331 days due to Ellison's habeas corpus petition, and 709 days unexplained. Then, it proposed three ways to allocate responsibility for this time: (1) 996 days to Ellison (all delays except the unexplained days) and 709 days to the State; (2) 894 days to Ellison (his continuances, the time the habeas corpus petition was pending, and half the agreed continuances) and the remaining 811 days to the State; and (3) 792 days to Ellison (his continuances and the time the habeas corpus petition was pending) and 913 days to the State. In each calculation, the court assigned to the State the delay after the May 6, 2013, hearing because it could not attribute that delay to either party.

The court deferred taking action so the parties could offer their own explanations to allocate responsibility for the postponements. The court told the parties, "[Y]ou can add any other documents you think are necessary or in whatever other way you think is appropriate to clarify how you think the breakdown should be allocated." In response to that invitation, the State filed a document outlining its view of the reasons for the delay in proceeding to trial. The State offered three justifications.

First, under the heading "*Justifications for Delay: Continuances by Ellison*," the State listed all postponements from the probable cause hearing on June 25, 2009, through a February 8, 2013, status conference. This included the agreed continuances and periods during which the case was administratively reassigned among district judges. It also included those periods during which Ellison's motions for release and habeas corpus petition were pending. The State claimed Ellison's counsel agreed to extensions of time to respond to his motions, noting he was "in no rush" and to "[t]ake what time you need," and that this court's action on the habeas corpus petition "could obviate the need to respond . . . for the moment."

6

Second, under a heading "*Justifications for Delay: Continuances by Petitioner*," the State assumed a single unopposed continuance it obtained in March 2013 because its expert would be out of the country on the then-upcoming trial date.

Finally, under the heading "*Justifications for Delay: Motion Practice by Ellison,*" the State attributed all delay after the May 6, 2013, hearing to Ellison. It noted the court heard "a variety of motions and set further deadlines" at the hearing. It argued "motion practice was in full bloom" when Ellison's habeas corpus petition was dismissed shortly after the hearing. It pointed out Ellison deposed a State witness during this time, there was a status conference at which the parties agreed on deadlines for the State to respond to Ellison's pending motions, and there were three additional motion hearings.

Ellison responded by urging his release based on application of the Sixth Amendment speedy trial analysis from *Barker*, 407 U.S. at 530. He argued he had been deprived of a trial within a meaningful time because the delay "has been unreasonable and there has been no effort made in the last four years by the State to make the case move faster and no effort by the State since the filing of the speedy trial/due process motion." He claimed "the bulk of [the delay] has been assignable to the State and for no good reason. The State took 10 months just to file responses to [his] . . . due process/speedy trial motion." He further argued he had asserted his speedy trial right in June 2012 and had "been prejudiced by having been held in prison, shackled in public and subject to hardships with no conviction, no sentence and with limited access to mental health treatment, all awaiting a determination of whether he is a mentally ill person who requires ongoing treatment." He claimed the State should be responsible for the time during which his habeas corpus petition was pending based on the State's delay responding to his motions.

7

On March 7, 2014, the district court agreed the delay violated Ellison's due process rights, dismissed the action, and ordered Ellison released. The court addressed each of the *Barker* factors. First, it said there were 1,705 days between the probable cause hearing and the scheduled trial date, a presumptively prejudicial delay. It observed Ellison was confined with no opportunity for bail or other means of securing release from custody. Second, it noted some delays were caused by each party but found the calculation most favorable to the State was 360 days, which it noted was more than five times the 60-day trial deadline set out in the statute. The court further reasoned that Ellison had no duty to bring himself to trial and that the State had pursued the statutory amendments eliminating the original mandatory KSVPA time limits, which triggered a "disincentive" for either party to proceed to trial. This last remark apparently was referring to the State's advocating for legislative action to ease the previously mandatory statutory time limits. Third, the court noted Ellison had filed three motions for release in June 21, 2012. Finally, the court held prejudice was presumed, regardless of how the time was allocated.

The State moved to alter or amend the judgment. The State pointed out that, though the court appeared to rely on Ellison's constitutional right to speedy trial, no such right exists in civil cases. The State conceded the *Barker* factors were appropriate to measure whether Ellison's due process rights were violated, but it complained the court seemed to allot the entire delay to the State, while also recognizing the delay was largely shared. The State further argued the district court failed to analyze factors other than the delay's length. The State requested additional findings of fact and conclusions of law to support the release order if the court was not going to reverse itself. The district court denied the motion. The State appealed.

A Court of Appeals panel reversed and remanded the case for further proceedings to more fully address the due process issue. *In re Care & Treatment of Ellison*, 51 Kan.

App. 2d 751, 760, 359 P.3d 1063 (2015). The panel held *Barker* supplied the appropriate framework but that the district court failed to make adequate findings to support its ruling. 51 Kan. App. 2d at 755, 760.

We granted Ellison's petition for review and ordered additional briefing on whether *Barker* supplies the appropriate framework for measuring a due process claim for pretrial delays in KSVPA proceedings. The State did not cross-petition for review of the panel's decision to reject the State's argument to presume missing findings in its favor. See 51 Kan. App. 2d at 760.

Because Ellison did not cross-appeal from any adverse district court rulings and the State did not cross-petition from the panel's decision, the only remaining question is whether the delay violated Ellison's due process rights. See Supreme Court Rule 8.03(h)(1) (2015 Kan. Ct. R. Annot. 78) (scope of review of panel decision in civil case includes issues both presented in petition for review and upon which review granted, and at court's discretion, any other issues presented to panel and preserved for review). Jurisdiction is proper. See K.S.A. 60-2101(b) (review of Court of Appeals decisions).

THE DENIAL OF ELLISON'S SPEEDY TRIAL RIGHT

Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S.

9

319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). "When the state seeks to impose physical restraints of significant duration on a person it must afford him fair procedure to determine the basis and legality of such a deprivation of liberty . . . ." 3 Rotunda & Nowak, Treatise on Constitutional Law, Substance and Procedure § 17.9(a)(v) (2016). "'[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Eldridge*, 424 U.S. at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 [1972]). But its fundamental requirement is the opportunity to be heard at a meaningful time and in a meaningful manner. 424 U.S. at 333; see also *Kaley v. United States*, 571 U.S. ___, 134 S. Ct. 1090, 1114, 188 L. Ed. 2d 46 (2014) (citing *Eldridge*, 424 U.S. at 333); *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007) (same).

All agree Ellison's detention under the KSVPA is a deprivation of liberty that requires due process protection. See *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."); *In re Care and Treatment of Foster*, 280 Kan. 845, 854, 127 P.3d 277 (2006) (same). And neither party disputes that the opportunity to be heard within a meaningful time imposes limits on the time that could elapse between Ellison's probable cause hearing and trial.

The substantive findings required under the KSVPA to justify commitment satisfy due process, *i.e.*, a person's due process rights have not been violated if he or she is committed based on those findings. See *Kansas v. Hendricks*, 521 U.S. 346, 358, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) ("The precommitment requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness."). But under the

10

*Barker* test, we can infer a person's due process rights can be violated by an excessive delay in making those required findings while a KSVPA respondent is confined awaiting them. See *Barker*, 407 U.S. at 530 (noting length of delay is one of the factors to be considered in determining whether defendant has been deprived of his due process rights).

The *Addington* Court holds that to satisfy the due process standard of proof for civil commitment a court must inform a factfinder that proof of commitment requirements must be greater than a preponderance of the evidence. 441 U.S. at 427 ("[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence."). The KSVPA exceeds this by demanding that the State prove beyond a reasonable doubt a respondent meets the requirements for commitment. See K.S.A. 59-29a07(a) ("The court or jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator."). Here, in the time between his initial detention and trial, Ellison was confined in jail with only a determination that there was probable cause to believe he met the statutory criteria. His liberty interests are surely implicated under such circumstances.

Barker *supplies the appropriate test.*

The first question is whether the panel erred using *Barker* as its framework for assessing Ellison's due process claim. The State defends the panel's decision, but Ellison argues we could apply the test set out in *Eldridge*, 424 U.S. 319. But because Ellison's argument is not persuasive, we decline to do so.

The *Barker* Court held a more-than-four-year delay between a defendant's arrest and trial did not violate defendant's Sixth Amendment right to a speedy trial. See 407

11

U.S. at 536. In determining how to assess the speedy trial claim, the Court first observed three ways in which "[t]he right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused." 407 U.S. at 519. First, it acknowledged "the general concern that all accused persons be treated according to decent and fair procedures" along with "a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." 407 U.S. at 519. Second, the Court noted a delay could work to the accused's advantage by weakening the prosecution's case as witnesses become unavailable or their memories fade. 407 U.S. at 521 ("Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself."). Third, the court said, "[P]erhaps most importantly, the right . . . is a more vague concept than other procedural rights. It is, for example, impossible to determine with precision when the right has been denied." 407 U.S. at 521.

Given these unique qualities, the *Barker* Court rejected two "inflexible approaches" to speedy trial claims: one imposing a fixed time period to try cases "because it goes further than the Constitution requires," and another presuming waiver from a defendant's failure to demand a speedy trial "because it is insensitive to a right which we have deemed fundamental." 407 U.S. at 529-30. Instead, the Court concluded a balancing test should apply "in which the conduct of both the prosecution and the defendant are weighed." 407 U.S. at 530. The Court then noted: "A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis[,]" and concluded it could "do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right." 407 U.S. at 530. Those factors were "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530.

In Ellison's case, both the panel and the State relied on *United States v. $8,850*, 461 U.S. 555, 103 S. Ct. 2005, 76 L. Ed. 2d 143 (1983), for the proposition that the *Barker* factors should be used to evaluate his due process claim. In *$8,850*, customs officials seized currency and held it for 18 months before filing a civil forfeiture proceeding. The question was whether the delay violated the owner's due process rights. 461 U.S. at 556.

In deciding what test to apply, the Court rejected the government's argument that the time period was analogous to a delay between the commission of an offense and the initiation of prosecution. Instead, it reasoned:

> "A more apt analogy is to a defendant's right to a speedy trial once an indictment or other formal process has issued. In that situation, the defendant no longer retains his complete liberty. Even if he is allowed to post bail, his liberty is subject to the conditions required by his bail agreement." 461 U.S. at 564.

The Court did not believe the distinction between the Sixth Amendment right to a speedy trial and the Fifth Amendment right to due process in the deprivation of property was significant. It explained:

> "[T]he Fifth Amendment claim here—which challenges only the length of time between the seizure and the initiation of the forfeiture trial—mirrors the concern of undue delay encompassed in the right to a speedy trial. The *Barker* balancing inquiry provides an appropriate framework for determining whether the delay here violated the due process right to be heard at a meaningful time." 461 U.S. at 564.

The *$8,850* Court's analogy, likening the pretrial circumstances of a person whose property was seized to the pretrial conditions of a person indicted or charged with a criminal offense, is just as applicable to a person being detained after a probable cause

13

hearing pending a KSVPA trial. Like the owner of seized currency, who has been deprived of property, after a probable cause determination the KSVPA respondent's personal liberty is restricted while awaiting trial.

In *Eldridge*, the issue was whether due process required that a social security disability benefit recipient be afforded an evidentiary hearing before the benefits were terminated. The Court noted: "A claim to a predeprivation hearing as a matter of constitutional right rests on the proposition that full relief cannot be obtained at a postdeprivation hearing." 424 U.S. at 331. Accordingly, the Court said the procedural protections required by due process turn on the circumstances, so "resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected." 424 U.S. at 334.

Under the *Eldridge* balancing test, to determine whether procedural due process has been afforded to a litigant, a court weighs "(1) the burdens that a requested procedure would impose on the Government against (2) the private interest at stake, as viewed alongside (3) 'the risk of erroneous deprivation' of that interest without the procedure and 'the probable value, if any, of [the] additional . . . procedural safeguard[ ].'" *Kaley*, 134 S. Ct. at 1100 (quoting *Eldridge*, 424 U.S. at 335).

Ellison relies solely on *In re Care & Treatment of Sykes*, 303 Kan. 820, 367 P.3d 1244 (2016), for his suggestion that *Eldridge* applies. But *Sykes* is not persuasive on this question. In that case, a KSVPA respondent argued the act violated his due process rights because it subjected him to confinement without the ability to assist in his own defense, since the act did not require a respondent to be competent to stand trial. Contrary to Ellison's argument, the *Sykes* court did not apply *Eldridge* but concluded the absence of a competency requirement in the KSVPA did not violate the respondent's due process

14

rights based on "[t]he combination of a constitutionally sound confinement procedure with a rule that competence is not required in civil proceedings . . . ." 303 Kan. at 825.

The *Eldridge* test is a means to determine "[t]he type and quantity of procedural protection that must accompany a deprivation of a particular property right or liberty interest . . . ." *In re J.D.C.*, 284 Kan. at 166 (considering whether parent in child in need of care case entitled under Due Process Clause to confront child upon whose testimony termination of parental rights was based). Resort to the *Eldridge* test may be required in three areas of procedural due process rulings: (1) to determine whether an individual is entitled to a predeprivation hearing, (2) if a hearing is required, to decide the procedures to be employed at the hearing, *e.g.*, an informal hearing versus a full adversarial process, and (3) if formal adversarial process is required, to determine the standard of proof required to justify the deprivation. 3 Rotunda & Nowak, Treatise on Constitutional Law § 17.8(i).

The due process claim in *Sykes* fell squarely into one of the "areas of due process rulings" amenable to an *Eldridge* analysis: the procedures to be employed at a formal hearing. *Cf. Addington*, 441 U.S. at 427 (balancing individual's liberty interests and government's interests in providing care to mentally ill and protecting society from dangerous tendencies of some mentally ill individuals, in light of legal process' purpose of reducing risk of erroneous decisions, to what standard of proof is required in civil commitment proceedings); *Barry v. Barchi*, 443 U.S. 55, 66, 99 S. Ct. 2642, 61 L. Ed. 2d 365 (1979) (balancing horse trainer's interest in prompt hearing after license suspended against government's interest in "an appreciable delay in going forward with a full hearing" and holding statutory procedures to conclude temporary suspension under scheme that provided no time within which to hold hearing and permitted period twice suspension length to issue final order violated due process); *In re Care & Treatment of Ontiberos*, 295 Kan. 10, 25, 287 P.3d 855 (2012) (applying *Eldridge* and holding KSVPA

15

respondent has due process right to appointed counsel at trial); *State v. Easterling*, 289 Kan. 470, 482, 213 P.3d 418 (2009) (applying *Eldridge* factors and holding procedures for presentation of information sentencing court would consider in imposing sentence employed at sentencing hearing satisfied due process); *In re J.D.C.*, 284 Kan. at 166 (considering whether parent in child in need of care case entitled under Due Process Clause to confront child upon whose testimony termination of parental rights was based).

We believe *Barker*'s "ad hoc" approach is better suited to meet the infinite variations in specific cases of claimed undue delay in KSVPA proceedings. This is illustrated by the Wisconsin Supreme Court's decision in *State v. Beyer*, 287 Wis. 2d 1, 707 N.W.2d 509 (2006), in which the court held a 22-month delay—between the respondent's annual periodic examination report and a post-report probable cause hearing to determine whether respondent was still a sexually violent person—violated due process. Admittedly, the court applied *Eldridge*, but that analysis took it only so far as concluding the hearing must be held "promptly and within a reasonable time after" the report. 287 Wis. 2d at 24. But to determine if the delay in the case before it was reasonable, the court engaged in a *Barker*-like analysis in which it considered the length of the delay, the reason for it, and the prejudice it caused to the respondent. See 287 Wis. 2d at 30-31. And the Wisconsin Court of Appeals has subsequently measured reasonableness of pretrial delay using the *Barker* factors. See, *e.g.*, *State v. Villegas*, No. 2010AP2009, 2012 WL 1499889, at *2 (Wis. App. 2012) (unpublished opinion) (noting sexually violent predator commitment civil, not criminal but parties agreed *Barker* applied and cited persuasive authority, and applying *Barker* to assess delay); *State v. Stokes*, No. 2004AP1555, 2007 WL 521243, at *16 (Wis. App. 2007) (unpublished opinion) (holding detention under Wisconsin sexually violent predator act triggered Sixth Amendment right to speedy trial and applying *Barker* to assess delay).

We further observe that *Barker* or a *Barker*-like analysis has been applied in other jurisdictions to assess the pretrial delay in sexually violent predator commitment proceedings. See *Page v. Lockyer*, 200 Fed. Appx. 727 (9th Cir. 2006) (unpublished opinion) (applying *Barker* and holding 6-year delay between initial detention and trial under California sexually violent predator act did not violate right to speedy trial); *Morel v. Wilkins*, 84 So. 3d 226, 246 (Fla. 2012) (addressing respondent's *Barker* arguments on undue delay claim under Florida sexually violent predator act by assuming *Barker* applied and applying its factors).

Ellison's claim is that the delay in bringing his case to trial was so unreasonable that it violated his due process rights. We conclude that the panel and the district court did not err when they applied *Barker* to Ellison's due process claim. We base this on: (1) the similarities between Ellison's position and the facts that warranted the *Barker* analysis in *$8,850*; (2) the differences between the due process claim in this case and the other contexts to which *Eldridge* has generally been applied; and (3) *Barker*'s better ability to address the claim raised.

*The district court correctly applied* Barker.

The next question is whether the panel erred when it concluded the district court failed to render adequate factual findings and incorrectly based its release order solely on the length of delay.

*Standard of review*

"[W]hether due process was provided under specific circumstances raise[s] [an issue] of law, and an appellate court's review is unlimited." *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, 1272, 136 P.3d 457 (2006). Whether a lower court properly

17

applied the *Barker* factors is a question of law subject to unlimited review. See *State v. Hayden*, 281 Kan. 112, 126-27, 130 P.3d 24 (2006) (noting "[w]hether a defendant's constitutional right to a speedy trial has been violated is a question of law" and applying *Barker*); *State v. Rivera*, 277 Kan. 109, 113, 83 P.3d 169 (2004) (same); *State v. Weaver*, 276 Kan. 504, 505-06, 78 P.3d 397 (2003) (same).

But while the district court's application of *Barker* to a particular set of facts is a question of law, what the set of facts is seems to be a question for the district court. See *United States v. Molina-Solorio*, 577 F.3d 300, 304 (5th Cir. 2009) ("[A]pplication of the *Barker* test is at least a mixed question of fact and law . . . ."); *United States v. Tchibassa*, 452 F.3d 918, 924 (D.C. Cir. 2006) (reviewing "the district court's factual findings for clear error and its application of the *Barker* factors to the facts de novo"); *State v. Fitch*, 249 Kan. 562, 565, 819 P.2d 1225 (1991) (noting trial court concluded reason for delay was "more neutral" than deliberate hampering of defense and therefore weighed less heavily against State, and that "the record amply supports that finding").

Accordingly, we hold an appellate court should review factual findings underpinning a district court's application of the *Barker* factors for substantial competent evidence but should review de novo the legal conclusion drawn from those facts. See, *e.g.*, *State v. Walker*, 304 Kan. 441, 449, 372 P.3d 1147 (2016) (applying dual standard of review to suppression motion that turned on trial court's determination that confession was voluntary as required to satisfy the Fifth Amendment); *State v. Mossman*, 294 Kan. 901, 906, 281 P.3d 153 (2012) (applying dual standard of review to claim sentence disproportionate under State constitution, noting test for constitutional violation required both factual and legal determinations).

18

*Discussion*

In applying the *Barker* factors, courts are forced to "approach speedy trial cases on an ad hoc basis." *Barker*, 407 U.S. at 530. None of the factors are

"a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Barker*, 407 U.S. at 533.

In remanding this case to the district court, the panel reasoned:

"The district court . . . seemed to treat . . . presumptive prejudice [from the lengthy delay] alone as a legally sufficient ground to grant Ellison relief. But it simply triggers a full judicial review of the circumstances to assess the claimed constitutional deprivation.

"The district court did not make findings addressing the *Barker* factors with any particularity and seemed to more or less rest its decision on the overall length of the delay without considering the reasons for the glacial pace of the litigation or the prejudice to Ellison. Absent findings on those factors, we cannot affirm the district court's decision that the State violated Ellison's due process rights. Nor can we say the district court erred in its ultimate conclusion. We, therefore, must remand for further proceedings entailing, at the very least, more specific findings tailored to the *Barker* considerations." *Ellison*, 51 Kan. App. 2d at 756.

But the district court did not rely solely on the length of the delay. We consider each *Barker* factor next and conclude there is adequate factual support for the district court's legal conclusion that the State violated Ellison's due process rights.

19

(1) *Length of Delay*

When balancing the *Barker* factors, "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530; see also *Rivera*, 277 Kan. at 113 (same).

Ellison suffered a delay between the probable cause hearing and the last trial setting of 1,705 days. The parties, the district court, and the panel agreed this was long enough to trigger a balancing of the remaining factors to decide whether due process was violated. See *Ellison*, 51 Kan. App. 2d at 756 ("Everybody concedes the delay attributable to the State . . . was presumptively prejudicial . . . .").

(2) *Reasons for Delay*

The second factor is the reason the government assigns to justify the delay. It is "[c]losely related to the length of delay." *Barker*, 407 U.S. at 531. The Supreme Court has characterized this as an inquiry into "whether the government or the criminal defendant is more to blame for [the] delay." *Doggett v. United States*, 505 U.S. 647, 651, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992). When considering this factor,

"different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." *Barker*, 407 U.S. at 531.

20

In addition,

"although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness . . . . The Government, indeed, can hardly complain too loudly, for persistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice . . . ." *Doggett*, 505 U.S. at 657.

"It is . . . a fair generalization that any period of delay attributable to the defendant will . . . be considered to fall within the valid reason category." 5 LaFave, Israel, King & Kerr, Criminal Procedure § 18.2(c) (4th ed. 2015). See, *e.g.*, *United States v. Harmon*, 721 F.3d 877, 884-885 (7th Cir. 2013) (holding 30-day continuance to investigate defendant's postarrest conduct as evidence of consciousness of guilt a valid reason for delay); *Hakeem v. Beyer*, 990 F.2d 750, 766 (3rd Cir. 1993) ("[D]elays attributable to the dilatory actions of the defendant cut against a finding of a Sixth Amendment violation."); *Wells v. Petsock*, 941 F.2d 253, 258 (3rd Cir. 1991) ("When the reason for the delay originates with the defendant or his counsel, such delay will not be considered for purposes of determining whether the defendant's right to a speedy trial has been infringed."). This includes continuances obtained by defense counsel. *Rivera*, 277 Kan. at 116-17 (rejecting argument that defense counsel's continuances should not be weighed against defendant because defendant did not approve them).

The State faults the district court for failing to make a finding on precisely how much delay was attributable to each party. It further argues the reasons for the delay should "at worst" be a neutral factor because "[e]ven if one of the court's divisions of

21

time could be used, the court never made a finding that the State acted negligently or intentionally with bad faith." We disagree with both assertions because there is a burden on the State to justify its sluggishness in the prosecution of these cases. As the LaFave treatise notes:

"The initial question which must be asked is where the burden lies to supply the reasons in a particular case. The reference to 'the reason the government assigns' indicates that the burden is on the government. As a practical matter, however, this is likely to mean that the prosecution is afforded an opportunity to show a reason which falls in the 'valid' category, failing which the case will be treated as if there was a 'more neutral reason.' This is because a reason which is to be heavily weighted against the government will rarely be admitted or otherwise apparent from the record. And when the government simply offers no explanation at all, it has been held that the court 'can presume neither a deliberate attempt to hamper the defense nor a valid reason for the delay.'" 5 LaFave, Israel, King & Kerr, Criminal Procedure § 18.2(c).

Kansas caselaw agrees with this. See *Fitch*, 249 Kan. at 565 (absence of evidence as to what caused the delay "amply support[ed]" a negligence finding against the State because court told the State such evidence was necessary).

Clearly some of the delay was caused by Ellison's request for new counsel and some was caused by continuances requested by his attorneys. The district court calculated that this amounted to 461 days, which is borne out by the appearance docket in the appellate record. Ellison's "responsibility for some of the delay, his counsel['s] approval of the State's request for continuances, and the absence of any improper motive by the State balance the State's failure to justify the delay." *Rivera*, 277 Kan. at 176.

But while it is unclear what caused the remaining delay, the State admitted its responsibility for at least 326 days—an admission the district court acknowledged in its

22

ruling. It is also unclear which of the 1,705 days were the ones for which the State conceded responsibility. And while the district court did not make factual findings on the reason for the State's portion of the delay, the State did not offer a valid justification for it, save the need for a single continuance when an expert was unavailable. We note the State presented no actual evidence to support this justification or to show how long a delay it caused. We further note the State failed to produce evidence in support of its response to the district court's request for the parties' speedy-trial calculations that Ellison was *responsible* for all other delays in the case although it attached some materials suggesting Ellison acquiesced in some of the State's requests for delays.

Given the State's failure to demonstrate a valid reason for the delay in excess of the 461 days the record affirmatively discloses Ellison was responsible for, we can assume no valid reason for it exists—as opposed to remanding for further factual findings as the State suggests. But there is also no evidence the State intended the delays to hamper Ellison's defense. Consequently, as the record stands this factor does not weigh heavily against the State but "it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delay[ ] . . . ." *Doggett*, 505 U.S. at 657.

(3) *Assertion of the Right*

It is the State's duty to bring a defendant to trial. *State v. Fink*, 217 Kan. 671, 679, 538 P.2d 1390 (1975). Nevertheless, the court may weigh the defendant's efforts to assert the speedy trial right. *Rivera*, 277 Kan. at 117. On one hand, a "defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32. But on the other, "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 532. The Court rejected "the rule that a defendant who

23

fails to demand a speedy trial forever waives his right" and explained that balancing the defendant's assertion of the right as a single factor in the speedy trial analysis

> "would permit, for example, a court to attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces in long delay without adequately informing his client, or from a situation in which no counsel is appointed. It would also allow a court to weigh the frequency and force of the objections as opposed to attaching significant weight to a purely pro forma objection."
> 407 U.S. at 528-29.

"[A]n assertion that charges be dismissed for a speedy trial violation is not a value protected under *Barker*. . . . [A] demand to 'squash' an indictment is not a valid demand for a speedy trial." *Cowart v. Hargett*, 16 F.3d 642, 647 (5th Cir. 1994) (giving "assertion" factor "'strong evidentiary weight'" in favor of the State when defendant did not assert speedy trial right until four days before trial, and in doing so sought only to have the charges dismissed); see also *Villegas*, 2012 WL 1499889, at *10-11 (weighing an assertion factor against defendant, noting defense counsel did not make speedy trial demand, and holding sexually violent predator respondent's various motions to dismiss did not state desire for speedy trial on the merits). Similarly, failing to file a motion asserting the right to set the matter for hearing militates against weighing this factor in a defendant's favor. See *Rivera*, 277 Kan. at 117-18 (weighing an assertion of the right factor against defendant when he made "minimal attempts" to assert right, which were offset by two escapes from custody, that the motion claiming a hearing was untimely was filed only 3 days before the hearing, and that defendant failed to "set his motion with the court in a timely manner").

The record supports the district court's conclusion that Ellison asserted his right to a timely disposition in his June 21, 2012, motions. Ellison appears to have advanced this

point when attacking the KSVPA, having asserted that due to the act's lack of mandatory time limits, he

> "has been sitting in the Sedgwick County Jail for over three years having served his sentence and without having been found to be a sexually violent predator and he can stay there as long as the State wishes him to stay there and he has no basis to challenge the confinement because of the Legislative savings clause. This is decidedly punitive."

In addition, the State concedes Ellison asserted this right, so that much is not in doubt despite how thinly veiled it may be. The State instead focuses on Ellison's subsequent "actions . . . that were inconsistent with the assertion . . . ." One of these actions was his request for discovery in April 2013, which the State argues "would have caused considerable delay based on the depth of the request . . . ." But the State' argument goes more toward the reason for the delay rather than whether Ellison asserted his right. And again, the record lacks any evidence to support the State's contentions about how long a delay the discovery request would cause.

Regardless, this factor weighs only minimally in Ellison's favor, if at all, because the motions did not clearly assert the right. He did not demand a prompt trial but instead sought to have the case dismissed. Moreover, Ellison did not set the motions for hearing until a year after they had been pending, and Ellison opposed the State's request to argue them promptly.

(4) *Prejudice*

Under *Barker*, prejudice must be "assessed in the light of the interests of defendants which the speedy trial right was designed to protect. . . . : (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and

25

(iii) to limit the possibility that the defense will be impaired." 407 U.S. at 532. The only type of prejudice discussed by the district court or the parties was Ellison's pretrial incarceration. In that regard, the *Barker* Court said of pretrial incarceration:

> "[T]he disadvantages for the accused who cannot obtain his release are even more serious [than societal disadvantages of lengthy pretrial incarceration]. The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent." 407 U.S. at 532-33.

Similarly, the Wyoming Supreme Court observed about a nearly two-year pretrial detention:

> "Lengthy pre-trial incarceration is one of the factors giving rise to prejudice. . . . [Defendant] was incarcerated continuously from his arrest to his trial—720 days. During that time there is no question his liberty was severely restricted. He was not free on bond as other defendants in our speedy trial cases have been. His extended incarceration necessarily impacted his employment opportunities, financial resources and association. This factor weighs heavily in favor of [defendant]." *Berry v. State*, 93 P.3d 222, 237 (Wyo. 2004).

The State argues the district court erred in assessing prejudice because it focused only on the delay's length, which the court deemed prejudicial "regardless of how the time is allotted." The State asserts "[w]ithout any finding of negligence or bad faith delay by the State, the prejudice to the defense must be established. Since no such prejudice was alleged or established, this factor must weigh in the State's favor." But the district

26

court did more in its *Barker* analysis. It specifically relied on the fact that Ellison was incarcerated prior to trial without the possibility of release.

The record lacks detail about Ellison's criminal sentence—for instance, when it ended. And it similarly lacks specifics about his pretrial confinement. To be sure, evidence about the conditions of Ellison's pretrial detention, such as whether he had access to treatment, would have been useful. Nonetheless, this factor weighs very strongly in Ellison's favor. The district court and Ellison's statements that Ellison was confined in the Sedgwick County Detention Center pending trial are unchallenged by the State. And the KSVPA's provisions strongly suggest Ellison was detained solely awaiting trial on the KSVPA petition for the vast majority of the time between the State's petition and the district court dismissing his case, if not the entire period. See K.S.A. 59-29a03(a) (agency with jurisdiction to give attorney general notice of potential sexually violent predator's pending release 90 days in advance); K.S.A. 59-29a04(a) (attorney general to file petition within 75 days of receiving notice); K.S.A. 59-29a05(a) (if district court determines there is probable cause to believe respondent is sexually violent predator, it must direct that respondent be taken into custody).

*The* Barker *factors balance in Ellison's favor.*

As demonstrated by the *Barker* Court's strong sentiments about the prejudice arising from pretrial incarceration in criminal cases, pretrial incarceration in this civil commitment case weighs even more heavily in favor of our holding that the delay violated due process. For example, had Ellison been committed under the act immediately upon the State filing its petition, he would have received treatment and four annual examinations and four opportunities to petition for his release. See K.S.A. 59-29a08(a) (A person committed under the KSVPA "shall have a current examination of the person's mental condition made once every year." The person has "right to petition

27

the court for release over the secretary's objection."). These statutory opportunities were squandered while he sat in the Sedgwick County jail. As the panel in this case observed:

> "In criminal cases, a convicted defendant typically will receive credit against a sentence of imprisonment for the time spent in jail awaiting trial. There is no comparable benefit to someone adjudicated a sexually violent predator. The individual is detained for treatment and, thus, will be held for an indeterminate period theoretically dependent on progress made in the therapeutic regimen. The individual's pretrial detention is effectively lost for that purpose. No treatment is provided in jail—both because the facility isn't staffed to do so and because the individual hasn't been adjudicated a sexually violent predator. Those circumstances render pretrial confinement more oppressive in a civil commitment proceeding than in a criminal prosecution and weigh against extended delays in adjudicating a commitment petition." *Ellison*, 51 Kan. App. 2d at 759-60.

Based on the record before us—the State's admitted substantial responsibility for the largely unexplained delay, its shortcomings in justifying the delay when the district court afforded it the opportunity to do so, and the parties' apparent agreement that Ellison was jailed during the delay—we hold the delay violated Ellison's due process rights. *Cf. Fitch*, 249 Kan. at 568 ("The trial court told the State that it must present evidence to justify the delay, and the State did not . . . . Thus, the trial court had to consider that the State offered no evidence to justify the delay . . . . Based on the record before us, we cannot say the trial court erred in dismissing the case.").

There is no evidence of any improper motive lurking behind the State's role in the delay, but the State had an obligation to bring Ellison's case to trial. It cannot fulfill that obligation by remaining passive year after year. The extraordinary length of the delay to provide Ellison with his day in court and the obvious prejudice he suffered being incarcerated during that time compels the result as the district court determined.

28

CONCLUSION

The panel's decision to reverse the district court and remand for further proceedings is reversed. Judgment of the district court is affirmed.

Affirmed.

\* \* \*

STEGALL, J., concurring:  I join today's opinion based on my understanding that we are giving considerable deference to the district court's balancing of the *Barker* factors. At the heart of the Supreme Court's decision in *Barker* is a commitment to resolving speedy trial claims on an "as they come" basis that is dependent on the trial court's reasonable consideration of the totality of the circumstances rather than on rigid and inflexible legal maxims and rules. Indeed, any time a trial court is charged with conducting a "difficult and sensitive balancing process" that involves, at various stages, the "exercise [of] judicial discretion based on the circumstances," an appellate court ought to give deference to the trial court's efforts. *Barker v. Wingo*, 407 U.S. 514, 529, 533, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

The precise nature of that deference is described in a variety of ways by different courts. See *Doggett v. United States*, 505 U.S. 647, 652, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992) (granting a trial court's determination under the second *Barker* factor "considerable deference"); *United States v. Margheim*, 770 F.3d 1312, 1328 (10th Cir. 2014) "[T]hough we might have concluded that [the second] factor favors the government, we defer to the district court's weighing and its determination that *Barker*'s second factor is a wash."), *cert. denied*, 135 S. Ct. 1514 (2015); *United States v. Williams*, 372 F.3d 96, 112-13 (2d Cir. 2004) (reviewing the district court's constitutional

speedy trial challenge for an abuse of discretion); *United States v. Tantalo*, 680 F.2d 903, 910 (2d Cir. 1982) ("It is clear the considerations involved in applying the critical balancing test are confided to the trial court's discretion."); *United States v. Lai Ming Tanu*, 589 F.2d 82, 92 (2d Cir. 1978) (Oakes, J., concurring) ("[W]e must accord a substantial amount of deference to the court's decision, especially since the *Barker* test involves a 'vague' right and requires an ad hoc balance."); see also *State v. Rodriguez*, 790 So. 2d 1272 (Fla. Dist. App. 2001) ("We find that the trial court did not abuse its discretion and properly evaluated the four factors enumerated in [*Barker*] to determine whether a constitutional speedy trial violation had occurred."); *State v. Porter*, 288 Ga. 524, 526, 705 S.E.2d 636 (2011) ("The trial court's weighing of each factor and its balancing of all four factors—its ultimate judgment—are reviewed on appeal only for abuse of discretion."); *State v. Pierre*, 146 So. 3d 681, 684-85 (La. 2014) (reviewing the district court's application of the *Barker* factors for an abuse of discretion); *State v. Friberg*, 435 N.W.2d 509, 515 (Minn. 1989) ("Considering the *Barker* factors in light of all the circumstances, we find that the trial court did not abuse its discretion by ruling that there was good cause for the delay and that defendants were not denied their right to a speedy trial."); *State v. Selvage*, 80 Ohio St. 3d 465, 470, 687 N.E.2d 433 (1997) ("There is no indication that the trial court abused its discretion in applying the [*Barker*] test and making its determination, and that determination will be accorded due deference."); *State v. Hunsberger*, ___ S.E.2d ___, 2016 WL 5930127, at *2 (S.C. October 12, 2016) (analyzing defendant's federal and state speedy trial challenges for an abuse of discretion); *State v. Alajemba*, No. M2013-00968-CCA-R3-CD, 2014 WL 5840369, at *15 (Tenn. Crim. App. 2014) ("On appeal, the trial court's application of the four-part balancing test is reviewed for abuse of discretion."), *rev. denied* March 11, 2015 (unpublished opinion).

On the other hand, some courts assert no deference is required when reviewing a trial court's balancing of the *Barker* factors. See *United States v. Ghailani*, 733 F.3d 29,

44 (2d Cir. 2013) (recognizing that although other panels in the Second Circuit had previously used an abuse of discretion standard, "a district court is in no better position than a reviewing court to undertake the required balancing"); *People v. Crane*, 195 Ill. 2d 42, 51-52, 743 N.E.2d 555 (2001) (reasoning that because the trial court is in no better position than the reviewing court to apply the *Barker* factors, appellate courts should review a defendant's constitutional speedy trial challenge de novo); see also *Hurst v. State*, 195 So. 3d 736, 741 (Miss. 2016) (reviewing the defendant's speedy trial claim de novo where the record did not contain the district court's analysis of the *Barker* factors).

Our decision today does not attempt to stake out a precise position on the level of deference owed to a district court's balancing of the *Barker* factors. It is sufficient for my purposes today to note that I find the district court's balancing effort in this case was reasonable and supported by the evidence.